IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOHN PORTERFIELD and ANITA PORTERFIELD, | ) ) ) | SA-12-CV-815-DAE |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| JP MORGAN CHASE, N.A. and DEUTSCHE BANK, NATIONAL TRUST COMPANY, | ) ) ) ) | |
| Defendants. | ) ) ) | |

ORDER: (1) DENYING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is the Partial Motion for Summary Judgment (Dkt. # 81) filed by Plaintiffs John and Anita Porterfield ("Plaintiffs"), and the Motion for Summary Judgment (Dkt. # 92) filed by Defendants/Counter-Plaintiffs JP Morgan Chase, N.A., and Deutsche Bank, National Trust Company ("Defendants"). Charles Riley, Esq., appeared on behalf of Plaintiffs; Rachel Lee Hytken, Esq., appeared on behalf of Defendants. After careful consideration of the memoranda in support of and in opposition to the Motions, and in light of the parties' arguments at the hearing, the Court, for the reasons that follow, **DENIES**

Plaintiffs' Motion for Partial Summary Judgment and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment.

<u>BACKGROUND</u>

In December 2005, John Galland entered into a loan transaction with Long Beach Mortgage Company which was secured by a mortgage encumbering real property located at 2 Walnut Grove, Boerne, Texas 78006 (the "Subject Property"). Deutsche Bank eventually became successor in interest to Long Beach Mortgage Company, and Chase became the servicer of the loan. ("FAC," Dkt. # 8 ¶¶ 8–9.) In March 2006, Galland entered into a contract with Plaintiffs, who sought to purchase the Subject Property from him. (Dkt. # 1-1 ¶ 10.) When Galland later refused to sell, Plaintiffs sued Galland in state court for specific performance of the contract. (<u>Id.</u> ¶ 11.) On April 19, 2007, the state court rendered judgment in favor of Plaintiffs and awarded Plaintiffs ownership of the Subject Property. (FAC ¶ 7.) Later that year, Plaintiffs learned that, in addition to the mortgage lien, the Subject Property was also encumbered by two other judgment liens held by Warren Power & Machinery, L.P. and Frost National Bank of San Antonio. (<u>Id.</u> ¶ 10.)

A dispute arose between Plaintiffs and Defendants over the payoff of the lien that Defendants held on the Subject Property. On September 28, 2007, Plaintiffs filed suit against Defendants in the 216th Judicial District Court of

Kendall County, Texas (the "Underlying Lawsuit").    In September 2011, the

parties reached a Mediated Settlement Agreement ("MSA"), pursuant to which

Deutsche Bank agreed to release its lien if Plaintiffs tendered $120,000 to

Deutsche Bank by December 31, 2011.   (FAC, Ex. 1.)   According to Plaintiffs,

the parties discussed the existence of the two prior judgment liens and possessed

the mutual understanding that releases of the two prior judgment lines had been

obtained by Fidelity National Title Insurance Company pursuant to the title

insurance policy covering the Galland loan transaction.   (Id. ¶ 11.)   Although

Chase was not a party to the MSA because it had been dismissed from the

Underlying Lawsuit, Chase's attorney allegedly represented during mediation that

Chase would ensure that the title company filed releases of the judgment liens.

(Id. ¶ 12.)

        Plaintiffs did not meet the December 31, 2011 deadline for tendering

$120,000 to Deutsche Bank.    (Id. ¶¶ 13–14.)   According to Plaintiffs, they could

not obtain financing for the transaction because the title company had not filed

releases of the judgment liens.    (Id.)   Additionally, Defendants never allegedly

provided a "usable payoff statement."   (Id. ¶ 15.)   In spring 2012, Deutsche

Bank's attorney, Darrell Smith, allegedly represented to Plaintiffs that he was

working to remove the judgment liens and that Deutsche Bank would not foreclose

on the Subject Property before the filing the judgment lien releases.   (Id. ¶ 14.)

3

On August 7, 2012, Defendants conducted a foreclosure sale of the Subject Property.   (Id. ¶ 16.)   Plaintiffs did not receive advance notice of foreclosure sale.   (Id. ¶ 17.)

On August 20, 2012, Plaintiffs filed the instant lawsuit against Defendants in the 216th Judicial District Court of Kendall County, Texas, seeking to overturn the foreclosure sale.   (Dkt. # 1-1 at 6–18.)   Defendants timely removed the case to federal court on August 31, 2012.   (Dkt. # 1.)   On September 6, 2012, Defendants filed a Motion to Dismiss Plaintiffs' state-court petition.   (Dkt. # 3.)

On September 27, 2012, Plaintiffs filed the First Amended Complaint (Dkt. # 8), which rendered Defendants' Motion to Dismiss moot.    In the First Amended Complaint, Plaintiffs assert claims for breach of contract, wrongful foreclosure, negligent misrepresentation and violations of the Texas Debt Collection Practices Act and Texas Deceptive Trade Practices Act.   (FAC ¶ 19.) In the alternative, Plaintiffs assert a claim from promissory estoppel and for rescission of the MSA under the doctrine of mutual and/or unilateral mistake and ambiguity.   (Id. ¶¶ 20–22.)

Plaintiffs also filed an Application for Preliminary Injunction, seeking to prevent their eviction from the Subject Property.   (Dkt. # 9.)   On October 11, 2012, Defendants filed a response in opposition to Plaintiffs' Application for

4

Preliminary Injunction and a Motion to Dismiss Plaintiffs' First Amended Complaint.   (Dkt. ## 12–13.)   Defendants also filed a Counterclaim for breach of contract based on Plaintiffs' agreement in the MSA not to contest the foreclosure sale of the Subject Property if Plaintiffs failed to tender payment of $120,000 to Defendants by December 31, 2011.   (Dkt. # 15.)   On November 1, 2012, Plaintiffs filed a response in opposition to Defendants' Motion to Dismiss. (Dkt. # 19.)   Soon thereafter, Defendants filed a reply in support of their Motion to Dismiss.   (Dkt. # 22.)

On November 27, 2012, the Magistrate Judge issued a Memorandum and Recommendation that Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint be granted in part and denied in part.   (Dkt. # 28.)   On December 7, 2012, Defendants filed objections to the Memorandum and Recommendation.   (Dkt. # 31.)   Soon thereafter, Plaintiffs filed their own objections to the Memorandum and Recommendation.   (Dkt. # 32.)

On January 1, 2013, the Magistrate Judge filed a Memorandum and Recommendation that Plaintiffs' Motion for a Preliminary Injunction should be granted.   (Dkt. # 44.)   On January 11, 2013, Defendants filed objections to the Magistrate Judge's Memorandum and Recommendation.   (Dkt. # 50.)   Soon thereafter, Plaintiffs filed a response in opposition to Defendants' objections. (Dkt. # 51.)

On September 4, 2013, this Court heard oral argument on the Objections to the Magistrate Judge's November 27, 2012 Memorandum and Recommendation brought by Plaintiffs and Defendants, and also heard argument on Defendants' Objections to the Magistrate Judge's January 2, 2013 Memorandum and Recommendation.   In light of new discovery presented at the hearing, and to provide the parties an opportunity to settle the case, the Court: (1) vacated the Memoranda and Recommendations of the Magistrate Judge, (2) denied as moot without prejudice Defendants' Motion to Dismiss First Amended Complaint and Plaintiffs' Application for Preliminary Injunction, and (3) referred the case to the Magistrate Judge for a settlement conference.   (Dkt. # 73.)   The attempt at a settlement proved unsuccessful.

On January 22, 2014, Plaintiffs filed their Motion for Partial Summary Judgment.   (Dkt. # 81.)   Defendants filed a Response on February 4, 2014 (Dkt. # 89), and Plaintiffs filed a Reply on February 18, 2014 (Dkt. # 96).   On February 13, 2014, Defendants filed a Motion for Summary Judgment.   (Dkt. # 92). Plaintiffs filed a Response on March 3, 2014 (Dkt. # 99); Defendants filed a Reply on March 10, 2014 (Dkt. # 102).   Both motions are now before the Court.

STANDARD OF REVIEW

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

6

a matter of law."   Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 251–52 (1986).   The main purpose of summary judgment is to dispose

of factually unsupported claims and defenses.   <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 323–24 (1986).

  The moving party bears the initial burden of demonstrating the

absence of any genuine issue of material fact.   <u>Id.</u> at 323.   If the moving party

meets this burden, the non-moving party must come forward with specific facts

that establish the existence of a genuine issue for trial.   <u>ACE Am. Ins. Co. v.</u>

<u>Freeport Welding & Fabricating, Inc.</u>, 699 F.3d 832, 839 (5th Cir. 2012).   In

deciding whether a fact issue exists, "the court must draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence."   <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133,

150 (2000).   However, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary

judgment."   <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th Cir. 2003).   "Where

the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial.'"   <u>Matsuhita Elec. Indus.</u>

<u>Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting <u>First Nat'l</u>

<u>Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

## ANALYSIS

In their Motion for Partial Summary Judgment, Plaintiffs assert:

(1) the foreclosure was wrongful because the statute of limitations on Defendants'

right to foreclose on the lien had run at the time of the purported August 2012

foreclosure; (2) the foreclosure was wrongful because Plaintiffs were entitled to

notice from Defendants of the purported August 2012 foreclosure sale, but did not

receive such notice; and (3) the MSA is the product of mutual mistake concerning

the first position of the lien associated with the loan, and as such must be

rescinded.   (Dkt. # 81 at 8.)

Defendants have also filed a Motion for Summary Judgment asserting

their entitlement to summary judgment on Plaintiffs' (1) wrongful foreclosure

claim, (2) unreasonable debt claim, (3) negligent misrepresentation claim, (4)

TDCA claim, and (5) DPTA claim.   (See Dkt. # 92.)   Defendants also argue that

they are entitled to summary judgment on the breach of contract counterclaim.

(Id. at 25.)

Because these motions are so intertwined and frequently incorporate

by reference arguments made in separate motions, the Court will analyze the

parties' arguments by each respective claim.

I.   Breach of Contract Claim

Defendants argue that summary judgment is proper as to Plaintiffs'

8

breach of contract claim.    (See Dkt. # 92 at 2–13.)

A cause of action for breach of contract arises when a contract, including a settlement agreement, is breached.    See Padilla v. LaFrance, 907 S.W.2d 454, 461–62 (Tex. 1995).    In order to succeed on a breach-of-contract claim a plaintiff must prove: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach.    Mullins v. TestAmerica, Inc., 564 F.3d 386 (5th Cir. 2009) (citing Aguiar v. Segal, 167 S.W.3d 443, 450 (Tex. App. 2005)).

Plaintiffs do not argue that the Deed of Trust was breached.    Rather, Plaintiffs' breach-of-contract claims assert that Defendants (1) breached the MSA; (2) breached a promise they would not foreclose on the property while the releases of the two prior judgment liens were being obtained and filed; (3) breached a promise that they would extend the time for Plaintiffs to tender payment; and (4) breached a promise by failing to provide Plaintiffs with notice of the foreclosure sale to which they were entitled because they had contractually agreed to pay off the debt in question and were in privity with Defendants in connection with the debt.    Plaintiffs assert that oral promises made during and after the settlement negotiations formed unilateral contracts and, thus, Defendants are liable for breach of contract.    Each will be addressed in turn.

A.   <u>Breach of the MSA</u>

In their Amended Complaint, Plaintiffs allege that Defendant breached the terms of the MSA; specifically, Plaintiffs assert that Defendants (1) failed to timely provide a payoff statement to Plaintiffs, and (2) filed to ensure that the release of the judgment liens were filed by Fidelity National Title Insurance Company as required by the MSA.   (FAC ¶ 13.)

Defendants argue that they are entitled to summary judgment on Plaintiffs' breach-of-contract claim because the MSA did not require Defendants to take any action with respect to the two prior judgment liens; specifically, Defendants argue that the MSA imposed no obligation on Defendants with regard to the two other judgment liens, but by its plain language only required Defendants to release the Deutsche Bank Lien[1] provided that Plaintiffs timely tendered $120,000 by December 31, 2011—which Plaintiffs did not do.   (Dkt. # 92 at 6.)

In support of their assertions, Defendants point out that the MSA refers only to the Deutsche Bank Lien.   (<u>Id.</u> at 7.)   In response, Plaintiffs argue that Defendants, through the MSA, guaranteed them "free and clear title," which, in their belief, meant that Defendants agreed to release the two prior judgment

---

[1] As stated above, in November 2005, Galland executed a promissory note with a principal balance of $240,000 secured by a lien on the Property pursuant to a Deed of Trust with Deutsche Bank (the "Deutsche Bank Lien").   The MSA was signed between Deutsche Bank and the Plaintiffs.

liens.   (Dkt. # 99 at 3.)

   "If parties reach a settlement agreement and execute a written agreement disposing of the dispute, the agreement is enforceable in the same manner as any other written contract."   <u>Garza v. Villarreal</u>, 345 S.W.3d 473, 479 (Tex. App. 2011) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 154.071(a) (West 2005)).   "A settlement agreement is a contract, and its construction is governed by legal principles applicable to contracts generally."   <u>Id.</u> (quoting <u>Donzis v. McLaughlin</u>, 981 S.W.2d 58, 61 (Tex. App. 1998)).   In interpreting a contract, the court's primary concern is "to ascertain the true intent of the parties as expressed in the contract."   <u>Id.</u> (citing <u>Seagull Energy E&P, Inc. v. Eland Energy, Inc.</u>, 207 S.W.3d 342, 345 (Tex. 2006)).   "Although courts may consider the facts and circumstances surrounding the execution of the settlement agreement, such consideration 'is simply an aid in the construction of the contract's language.'" <u>Id.</u> (quoting <u>Sun Oil Co. v. Madeley</u>, 626 S.W.2d 726, 731 (Tex. 1981)).   "If, in light of the surrounding circumstances, the language of the contract appears to be capable of only one meaning, the court can then confine itself to the writing."   <u>Id.</u>

   "In construing a contract, courts examine the instrument as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."   <u>Id.</u> at 479–80 (citing <u>J.M. Davidson, Inc. v. Webster</u>, 128 S.W.3d 223, 229 (Tex. 2003)).   Courts must give terms their "plain,

ordinary, and generally accepted meaning unless the contract shows the parties use them in a technical or different sense."   Id. at 480.   "In construing a settlement agreement, a court may not rewrite the contract or add to its language."   Id.

Here, the key provisions of the MSA provide as follows:

1)   Plaintiffs have until December 31, 2014, to tender to Deutsche Bank the amount of $120,000 in full satisfaction and release of the lien held by Deutsche Bank on the property located at 2 Walnut Grove Road, Boerne, Kendall County, TX 78006, recorded at Vol. 963 pages 299-304 in the Kendall County real property records.

2)   If Plaintiffs tender this amount by that date, Deutsche Bank will promptly release its lien.   If Plaintiffs fail to tender this amount by that date, Deutsche Bank may foreclose the lien on the property, and Plaintiffs agree they will not oppose, contest or in any way delay or thwart the foreclosure.   Plaintiffs will also promptly vacate the property.

3)   Plaintiffs agree that they have not and will not convey any interest in the property unless and until they timely tender the agreed payoff to Deutsche Bank as discussed in paragraph 1 above.

4)   Plaintiffs hereby release Deutsche Bank National Trust Company, JPMorgan Chase Bank, N.A., Washington Mutual Bank and Long Beach Mortgage Trust Company from any and all claims which were asserted or could have been asserted in the lawsuit.

. . . .

(6)   Deutsche Bank will promptly prepare and tender (or its servicer will prepare and tender) a letter to Plaintiffs stating the agreed amount and due date of the agreed payoff set forth in paragraph 1 above.

(Dkt. # 92, Ex. B-5.)

The plain language of the MSA refers only to the Deutsche Bank Lien.   It specifically notes that Plaintiffs "have until December 31, 2014, to tender to Deutsche Bank the amount of $120,000 in full satisfaction and release of the lien held by Deutsche Bank."   (Id. ¶ 1.)   If Plaintiffs tendered the agreed payoff amount, Deutsche Bank agreed to "promptly release its lien."   (Id. ¶ 2 (emphasis added).)

Moreover, paragraph 6 provided that Deutsche Bank will prepare and tender a letter to Plaintiffs, confirming the agreed payoff amount and due date to pay in full satisfaction and release of the lien held by Deutsche Bank as provided in paragraph 1.   (Id. ¶ 6.)   Defendants have attached the letters referenced in paragraph 6.   The first, dated October 6, 2011, states:

> Dear Mr. and Mrs. Porterfield,
>
> This will serve to evidence for your purposes, Deutsche Bank's agreement that payment by you of the amount of $120,000.00 on or before December 31, 2011 will be accepted in full satisfaction of the lien held by Deutsche Bank on the property located at 2 Walnut Grove Road, Boerne, Kendall County, Texas 78006, recorded at Vol. 963, pages 299-304 in the Kendall County real property records, and on timely receipt of said $120,000.00 payment JPMorgan Chase Bank, N.A., as servicer for Deutsche Bank, will execute and deliver for recording such release of lien as shall be required to evidence same.

(Dkt. # 92, Ex. B-6.)   Neither this letter nor the MSA mention anything regarding releases of the two prior judgment liens.   Rather, both the letter and the MSA refer specifically to the Deutsche Bank Lien, even directing to the exact page

13

number of the lien referenced.   A second letter, dated November 14, 2011, was tendered with the exact same language.   (Id. at Ex. B-7.)

Nothing in the MSA mentions that releases of the prior judgment liens were to be filed prior to Plaintiffs' tender of the $120,000.   Nothing in the MSA even implies an obligation on Deutsche Bank to ensure the releases of the two judgment liens were to be filed prior to Plaintiffs' tender of the $120,000 to extinguish the Deutsche Bank Lien.   Although Plaintiffs argue that statements were made at the mediation and it was the parties "mutual understanding" that releases of the two prior judgment liens had been obtained and that Chase's attorney[2] ensured Plaintiffs that these releases would be filed, nothing in the terms of the MSA reflects this purported "mutual understanding."   On the contrary, a provision of the MSA states:

> Entire Agreement.   The parties to this Mediated Settlement Agreement and the signatories hereto further agree and understand that his Mediated Settlement Agreement constitutes the entire agreement and understanding between the parties as to the subject matter hereof, that there are no other understandings, agreements or other representations expressed or implied between the parties relating to the subject matter hereof, and that all prior or contemporary negotiations, discussions, representations, statements, understandings or agreements between them, written or oral, are superseded, null, void, and of no effect, and that the provisions of this Agreement are contractual and not mere recitals.

---

[2]  Chase was not a party to the MSA and did not sign the MSA; however, Plaintiffs assert that Chase participated in the mediation "as the agent of [Deutsche Bank]." (FAC ¶ 13.)

14

(Dkt. # 92, Ex. B-5 (emphases added).)    Thus, despite Plaintiffs' arguments to the contrary, they signed the MSA which specifically provided that "all prior . . . representations, statements, understandings or agreements between [the parties], written or oral, are . . . of no effect."    The MSA is clear—if the Plaintiffs tendered $120,000 to Deutsche Bank by December 31, 2011, Deutsche Bank agreed to "promptly release its lien."    There are no other conditions to be met.    Plaintiffs did not timely provide the $120,000; therefore, because they failed to tender the amount, Deutsche Bank was entitled to foreclose the lien on the property.    (See id. ¶ 2 "If Plaintiffs fail to tender this amount by that date, Deutsche Bank may foreclose the lien on the property, and Plaintiffs agree that they will not oppose, contest or in any way delay or thwart the foreclosure.").    Plaintiffs have not demonstrated that Defendants breached the MSA; the MSA did not require Defendants to do anything with regard to releases of the judgment liens and Defendants complied with the terms requiring them to provide a payoff statement.

As an alternative, Plaintiffs also argue that the MSA is ambiguous and, thus, must be set aside.    Ambiguity is a question of law, which a court may determine regardless of whether the parties have raised the issue.    See Coker v. Coker, 650 S.W.2d 391, 392–95 (Tex. 1983) (holding that a settlement agreement was ambiguous despite the parties' assertion to the contrary).    Lack of clarity does

15

not create an ambiguity; nor does an ambiguity arise merely because the parties to the agreement offer different interpretations of the agreement.   DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999).   An ambiguity arises when an agreement is susceptible to more than one reasonable meaning after the application of established rules of construction. Univ. Health Servs., Inc. v. Renaissance Women's Group, P.A., 121 S.W.3d 742, 746 (Tex. 2003).   If the contract language can be given a certain or definite meaning, then the contract is not ambiguous and the court should interpret it as a matter of law.   Id.

Here, the MSA is not ambiguous.[3]  As discussed above, the language clearly refers only to the Deutsche Bank Lien, even referencing that lien by page number and volume in the Kendall County Records.   The language of the MSA can be given a certain and definite meaning; thus, the contract is not ambiguous as a matter of law.

---

[3]  Plaintiffs also assert an argument that the MSA must be set aside due to mutual mistake.   (Dkt. # 81 at 16.)   "A party raising mutual mistake must prove there has been a definite agreement between the parties that has been misstated in the written memorandum because of a mistake common to both contracting parties." TIG Ins. Co. v. Sedgwick James of Washington, 184 F. Supp. 2d 591, 598 (S.D. Tex. 2001).   Here, Plaintiffs have not demonstrated that anything in the MSA was misstated regarding the two prior judgment liens; rather, the MSA is completely devoid of anything related to the two prior judgment liens, and explicitly provides that if Plaintiffs tendered the agreed payoff amount, Deutsche Bank agreed to "promptly release its lien."   (Dkt. # 92, Ex. B-5 ¶ 2 (emphasis added).) Accordingly, the Plaintiffs' mutual mistake argument is without merit.

Based on the foregoing, Defendants are granted summary judgment on Plaintiffs' breach-of-contract claim that Defendants breached the MSA.

B.    Oral representations made during mediation

To the extent Plaintiffs allege that statements made during the mediation were promises that formed unilateral contracts, any statements allegedly made during the mediation did not form the basis of a contract.    The language of the MSA clearly provides that all agreements between the parties, written or oral, that are not contained in the MSA are "superseded, null, void, and of no effect." (Dkt. # 92, Ex. B-5.)

Moreover, Plaintiffs may not use any statements made during the mediation pursuant to § 154.073 of the Texas ADR Act.    See Vick v. Waits, No.05-00-0011220CV, 2002 WL 1163842, at *2 (Tex. App. June 4, 2002). Section 154.073 provides that, subject to certain narrow exceptions, "a communication relating to the subject matter of any civil or criminal dispute made by a participant in an alternative dispute resolution, whether before or after the institution of formal judicial proceedings, is confidential is not subject to disclosure, and may not be used as evidence against the participant in any judicial or administrative proceeding."    Tex. Civ. Prac. & Rem. Code Ann. § 154.073(a) (West 2002).    Where a party seeks to use confidential communications made during mediation "to obtain evidence to potentially change the settlement

17

agreement," such statements are excluded from evidence by the mediation privilege.   See Hydroscience Technologies, Inc. v. Hydroscience, Inc., 401 S.W.3d 783, 795–96 (Tex. App. 2013).   Therefore, Plaintiffs may not use, as evidence of breach of contract, any alleged statements made during the mediation which resulted in the final MSA.

Additionally, the parties could not have added to new terms to the settlement agreement based on oral promises because Texas Rule of Civil Procedure 11 provides that any representations "touching any suit" must be in writing or made on the record in order to be enforceable.   See Tex. R. Civ. P. 11. In this case, the purported oral agreements at mediation address the judgment liens at issue in the Underlying Lawsuit and the release of Deustche Bank's lien on the Property.   Because these alleged unilateral contracts arose out of the transactions that made up the Underlying Lawsuit and were not made in writing, they are unenforceable under Rule 11.   Accordingly, Plaintiffs cannot use statements made during mediation, but not memorialized in the final settlement agreement, to establish the existence of a separate unilateral contract.[1]

Because Plaintiffs cannot established the existence of a separate

---

[1] To the extent Plaintiffs argue that they may use statements made during mediation to support their claims for mutual mistake and negligent misrepresentation, these constitute separate causes of action and have no bearing upon whether Plaintiffs have stated a claim for breach of contract.

unilateral contract with respect to promises made during mediation, their claim for breach of such a contract fails.

C.     Oral representations made following mediation

Plaintiffs have further asserted that Defendants breached multiple unilateral contracts by failing to follow through with oral promises made to the Plaintiffs after the mediation.   Specifically, Plaintiffs assert that (1) they were entitled to notice of the foreclosure sale; (2) Defendants would ensure releases of the judgment liens, and (3) Defendants represented to Plaintiffs that the property was not subject to foreclosure while judgment lien releases were being obtained and filed.   Although none of these alleged promises are provided for in the MSA, Plaintiffs allege that Defendants made promises to this effect that created an enforceable unilateral contract.

Defendants attack Plaintiffs' breach-of-contract claims as to oral representations made following mediation on two grounds: (1) that the alleged oral promises did not form enforceable contracts, and (2) that even if they formed enforceable contracts, Plaintiffs cannot prove damages because none were sustained as a result of any breach.

       i.     <u>Existence of a valid contract element</u>[4]

Defendants first argue that the alleged oral representations did not form the basis of an enforceable unilateral contract and, therefore, Defendants are entitled to summary judgment on Plaintiffs' breach of contract claim.   (Dkt. # 92 at 12.)

"In Texas, a unilateral contract is 'created by the promisor promising a benefit if the promisee performs.   The contract becomes enforceable when the promisee performs.'" <u>Watson v. Citimortgage, Inc.</u>, 814 F. Supp. 2d 726, 732 (E.D. Tex. 2011) (quoting <u>Vanegas v. Am. Energy Servs.</u>, 302 S.W.3d 299, 302 (Tex. 2009)).   In a unilateral contract, there is a promise by the promisor and acceptance through performance by the promisee.   <u>Id.</u>   "However, '[a] contract that does not require a party to furnish consideration, or oblige him to do anything, lacks mutuality, is unilateral, and is unenforceable.'"   <u>Id.</u> (quoting <u>Johnston v. Kruse</u>, 261 S.W.3d 895, 898 (Tex. App. 2008)).

Defendants cite <u>Watson</u> for the proposition that Defendants' promises to forbear from foreclosure, even if made, were illusory because Plaintiffs, as promisees, either did not perform or were not required to perform in order to

---

[4]  As stated above, in order to succeed on a breach of contract claim a plaintiff must prove: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach.   <u>Mullins</u>, 564 F.3d at 418.

receive the benefit.   Id. at 732.   In <u>Watson</u>, the plaintiffs asserted that Citimortgage breached a unilateral contract by promising to refrain from foreclosure during loan modification then nevertheless attempting to foreclose. <u>Id.</u> at 731.   The court concluded that the plaintiffs failed to allege a breach of a unilateral contract because the alleged promise remained illusory since Citimortgage neither required nor received any performance from Plaintiffs.

Here, Defendants assert that as in <u>Watson</u>, Plaintiffs have also failed to allege an enforceable unilateral contract because even assuming these representations were made to Plaintiffs, Plaintiffs were not required to perform in order to receive the benefit.   Plaintiffs respond that they did not contest the dismissal of the underlying litigation and did not seek to set aside the MSA in consideration of Defendants' post-mediation promises.   (Dkt. # 99 at 7.) Plaintiffs cite <u>Leonard v. Texaco</u>, 422 S.W.2d 160 (Tex. 1967), and argue that forbearance in asserting a legal right is a valid form of consideration.   (<u>Id.</u> at 6.)

Indeed, the Plaintiffs did not oppose the motion to dismiss, which was entered on May 29, 2012.   (<u>See</u> Dkt. # 92 at Ex.C-4.)   Plaintiffs cite to John Porterfield's deposition as evidence of this consideration:

Q: And did you have any oral agreements with Chase?

A: Yes.

Q: And what was that agreement?

A: That they were going to pursue the claim with Fidelity regarding the judgment liens and that there would be no foreclosure.

Q: And when was that agreement made?

A: I think that was late January 2012.

Q: And you made that agreement with whom at—

A: Darrell Smith.

Q: Darrell Smith?    And did he represent Chase?

A: Yes.

Q: And when you had that agreement, what did you promise to do on your end?

A: Not to do anything.

Q: So what do mean by that?

A: To give them the time they needed to get that done and then I would get the money and pay them and we would finish this up.

Q: Okay.    And were there any other promises that you made?

A: No.

(Dkt. # 92-10 at 15.)    John Porterfield also states that the reason he relied upon Smith's promise to ensure the releases of the judgment was because he was not allowed to file a claim with the title insurance company:

Q: Okay.    And so why did you contact Mr. Smith?

A: Because Fidelity had indicated that they would not allow me to

22

make a claim on the title policy since I was not a named insured but that the bank would have to do so.

Q: Okay.    And why did you think that Mr. Smith could help you? Or did you think he – let me ask that question: Why did you think Mr. Smith could help you or how did you think he could help you?

A: He was the attorney for the bank.

Q: And what did you ask of him?

A: To file the claim.    And I gave him all the paperwork and everything he needed.

Q: And what was your anticipation from him filing the claim?

A: That we would get these judgment liens resolved and then we could get a clean title to the property, get the financing, get this thing paid off, and finally have this nightmare over with.

Q: And when you asked him to file the claim, what did he say?

A: Said he would.

(Dkt. # 92-10 at 9–10.)

Plaintiffs also cite to the following from John Porterfield's deposition as evidence of Plaintiffs' consideration for Defendants' post-mediation promises:

[I]n the spring of 2012, Defendant Deutsche Bank's attorney Darrell Smith represented to me that he was working to remove the judgment liens and that the property was not subject to foreclosure while he was obtaining and filing the judgment lien releases.    In reliance on these promises, my wife and I did not contest the dismissal of the underlying litigation and did not seek to set aside the MSA as the product of mutual mistake and/or fraud.

(Dkt. # 99-1.)

23

The evidence set forth by Plaintiffs raises a genuine issue of material fact as to whether the Plaintiffs agreed not to contest the dismissal of the underlying action in consideration of Defendants' promises made after the mediation.   Thus, Defendants are not entitled to summary judgment on this element of Plaintiffs' breach of contract claim.

   ii. <u>Damages element</u>

Defendants next argue that even assuming Plaintiffs can demonstrate an enforceable contract, Defendants are entitled to summary judgment because Plaintiffs cannot prove damages.   Specifically, Defendants argue that Plaintiffs cannot show resultant damages from a breach of Defendant's oral promise to ensure releases of the judgment liens were filed because the abstracts of judgment never attached to the Property; therefore, the judgment liens did not prevent Plaintiffs from obtaining financing.[5]   In support, Defendants argue that the original owner, Tim Nobles, used the Property as his homestead and, thus, the judgment liens could not attach to the Property.

Defendants attach two letters from Fidelity National Title Insurance Company as evidence that the judgment liens did not affect Plaintiffs' ability to obtain financing (thus preventing Plaintiffs from establishing damages).   (Dkt.

---

[5] Again, Plaintiffs have alleged that judgment liens inhibited their ability to obtain financing to pay the $120,000.00 payoff amount to Defendants.   (<u>See</u> Dkt. # 99 ¶ 15.)

# 92, Exs. G-1, G-2.)   The first letter, dated April 26, 2013, is addressed to Lance

Lewis, counsel for Defendant.   The letter indicates it is in response to Mr. Lewis's

"January 29, 2013 letter on behalf of JPMorgan Chase Bank, N.A., as servicer for

Deutsche Bank National Trust Company . . . tendering defense in the [Underlying

Lawsuit] and submitting a claim in regard to two judgments."   The letter is a

denial of Defendants' tender of defense and claim involving the two judgments.

As to the judgment liens, it states:

> In regards to the judgments that the Suit alleges attached to the
> Property as liens (the "Judgments"), the Company's investigation
> indicates that the Property was designated as the homestead of Tim R.
> Noble from the time the Judgments were recorded in 2005 until the
> Property was conveyed to the Borrowers.   Under Texas Property
> Code § 41.001, homestead property is "exempt from seizure for the
> claims of creditors ..." Accordingly, the Judgments did not attach as
> liens on the Property and do not constitute encumbrances on the
> Property.   The judgments therefore do not implicate any of the
> covered risks under the Policy.   If, however, someone takes action to
> enforce the Judgments as liens on the Property, please notify the
> Company immediately and the claim will be reevaluated.

(Id., Ex. G-1.)   Defendants additionally cite to a second letter from Fidelity

National Title Insurance Company in regards to Defendants' request for

reconsideration of the Company's coverage determination as set forth in the April

26, 2013 letter.   The letter denies Defendants' reconsideration request and states:

> With regard to the Judgments, the Company refused to issue a new
> lender's and owner's policy of the title insurance involving the
> Plaintiffs and their potential refinance based upon the ongoing Suit,
> not because of the Judgments. It is still the Company's position that

25

> the Judgments did not attach as liens on the Property due to Texas
> Property Code § 41.001 regarding homestead property.
> Additionally, the Judgments are not being enforced.

(Id., Ex. G-2.)

Defendants argue that these letters from Fidelity National Title Insurance Company conclusively establish that the abstracts of judgment never attached to the Property and, therefore, Plaintiffs were not prevented from obtaining financing and cannot prove damages.   (Dkt. # 92 at 11.)

In response, Plaintiffs do not dispute that judgment liens do not attach to homestead property, but argue that there is no competent evidence to establish that Nobles held the Property as his homestead before selling it.    Plaintiffs cite Hoffman v. Love, 494 S.W.2d 591, 594 (Tex. App. 1973) for the proposition that a judgment lien attaches to the judgment debtor's interest if he abandons the property as his homestead before he sells it.    Id.    Plaintiffs argue that Defendants have set forth no competent evidence to show that Nobles, in fact, did not relinquish homestead status on the Property prior to selling it.

Plaintiffs also object to the letters proffered by Defendants, arguing that they contain inadmissible hearsay regarding the alleged reasons that Fidelity National Title Insurance Company denied the title claim made by Defendants in this matter and refused to issue a new title policy with respect to the judgment liens in question.   (Dkt. # 96 ¶ 2.)    The Court agrees.

26

Defendants have introduced the letters from Fidelity Title Insurance Company as evidence to prove the truth of the matter asserted—that the judgment liens never attached to the Property and, thus, did not inhibit Plaintiffs ability to obtain financing.   See Fed. R. Evid. 801.   The evidence does not qualify under any of the hearsay exceptions and Defendants have not argued as such. Therefore, the letters are inadmissible hearsay and are inappropriate for this Court's consideration of Defendants' Motion for Summary Judgment.

On the other hand, Plaintiffs argue they have produced evidence that there is a genuine issue of material fact as to whether Nobles held the Property as his homestead before selling it.   Plaintiffs cite to John Porterfield's declaration, in which he states that Nobles may not have held the Property as his homestead prior to selling it to Galland:

> My home is up the hill from the property in question.   Therefore, I am aware that Timothy Nobles was not living at the property in question at the time he sold it to Jon Galland.   He was a fugitive from justice at that time, according to the Kendall County Sheriff. As such, there is at the very least doubt as to whether the property in question was his homestead at the time he sold it to Jon Galland via a power of attorney.   Litigating that issue would most likely be very difficult, expensive, and time consuming, which is why no title company has agreed to insure around the judgment liens in question.

(Dkt. # 99-1 at 3.)

The Court concludes that there is a genuine issue of material fact as to whether the judgment liens did in fact inhibit Plaintiffs' ability to obtain financing;

27

therefore, Defendants are not entitled to summary judgment on Plaintiffs'

breach-of-contract claims based upon promises made after the mediation.

In sum, with respect to all of Plaintiffs' breach-of-contract claims,

Defendants are entitled to summary judgment on Plaintiffs' breach-of-contract

claims that (1) Defendants breached the MSA, and (2) Defendant breached an oral

contract made during mediation.   However, Defendants are not entitled summary

judgment on Plaintiffs' breach-of-contract claim that Defendants breached oral

contracts made <u>after</u> mediation regarding filing releases of the judgment liens and

ensuring that the Property was not subject to foreclosure while judgment lien

releases were being obtained and filed.

II.   <u>Wrongful Foreclosure Claim</u>

In order to prevail on a wrongful foreclosure claim, a plaintiff must

prove three elements: (1) a defect in the foreclosure sale proceedings; (2) a grossly

inadequate selling price; and (3) a causal connection between the defect and the

grossly inadequate selling price.   <u>Water Dynamics, Ltd. v. HSBC Bank USA,</u>

<u>Nat. Ass'n</u>, 509 F. App'x 367, 369 (5th Cir. 2013) (citing <u>Sauceda v. GMAC</u>

<u>Mortg. Corp.</u>, 268 S.W.3d 135, 139 (Tex. App. 2009)).

Plaintiffs have moved for partial summary judgment on their wrongful

foreclosure claim, arguing they are entitled to summary judgment because (1) the

foreclosure was wrongful as a matter of law because the statute of limitations on

28

Defendants' right to foreclose on the lien had run at the time of the purported

August 2012 foreclosure, and (2) the foreclosure was wrongful as a matter of law

because Plaintiffs were entitled to notice from Defendants of the purported August

2012 foreclosure sale, but did not receive such notice.   (Dkt. # 81 at 8.)

> A.   <u>Statute of Limitations</u>

Plaintiffs first assert they are entitled to summary judgment on their

wrongful-foreclosure claim because the statute of limitations expired on

Defendants' ability to foreclose and, thus, the foreclosure was void as a matter of

law.   Although Plaintiffs have asserted a "wrongful foreclosure" claim, this

argument is made to set aside the foreclosure sale as void.   <u>See</u> <u>Chale Garza</u>

<u>Investments, Inc. v. Madaria</u>, 931 S.W.2d 597, 600 (Tex. App. 1996) ("When a

foreclosure sale is void, the purchaser does not acquire title to the property.").

Under state law, a sale of real property under a power of sale in a

mortgage or deed of trust that creates a real-property lien must be made not later than

four years after the day the cause of action accrues.   Tex. Civ. Prac. & Rem.Code

§ 16.035(b); <u>McLemore v. Pac. Sw. Bank</u>, 872 S.W.2d 286, 292 (Tex. App. 1994).

When this four-year period expires, the real-property lien and the power of sale to

enforce the lien become void.   Tex. Civ. Prac. & Rem.Code § 16.035(d).

"If a note or deed of trust secured by real property contains an optional

acceleration clause, default does not ipso facto start limitations running on the note.

29

Rather, the action accrues only when the holder actually exercises its option to accelerate." Holy Cross Church of God in Christ v. Wolf, 44 S.W.3d 562, 567 (Tex. 2001) (citing Hammann v. H.J. McMullen & Co., 62 S.W.2d 59, 61 (Tex. 1933); Curtis v. Speck, 130 S.W.2d 348, 351 (Tex. App. 1939)). Effective acceleration requires two acts: (1) notice of intent to accelerate, and (2) notice of acceleration. See Shumway v. Horizon Credit Corp., 801 S.W.2d 890, 892 (Tex. 1991); Ogden v. Gibraltar Sav. Ass'n, 640 S.W.2d 232, 233 (Tex. 1982). Both notices must be "clear and unequivocal." Shumway, 801 S.W.2d at 893. Absent evidence of abandonment or a contrary agreement between the parties, a clear and unequivocal notice of intent to accelerate and a notice of acceleration is enough to conclusively establish acceleration for purposes of statute of limitations accrual. Holy Cross Church of God in Christ, 44 S.W.3d at 574.

Plaintiffs assert that it is undisputed that the August 7, 2012 foreclosure sale took place nearly five years after Defendants initially accelerated the loan, which, according to Plaintiffs, occurred no later than August 14, 2007. (Dkt. # 81 at 9.) In response, Defendants do not contest the time period between when the cause of action accrued and the date of foreclosure but argue that pursuant to §§ 16.035 and 16.062, a one-year tolling period applies. (Dkt. # 89 at 10.)

Section 16.035 of the Texas Civil Practice and Remedies Code provides:

(b) A Sale of real property under a power of sale in a mortgage or deed of trust that creates a real property lien must be made not later than four years after the day the cause of action accrues.

(c) The running of the statute of limitations is not suspended against a bona fide purchaser for value, a lienholder, or a lessee who has no notice or knowledge of the suspension of the limitations period and who acquires an interest in the property when a cause of action on an outstanding real property lien has accrued for more than four years, except as provided by:

> (1) Section 16.062, providing for suspension in the event of death;

Tex. Civ. Prac. & Rem. Code § 16.035(b)–(c).   Section 16.062 provides that

(a) The death of a person against whom or in whose favor there may be a cause of action suspends the running of an applicable statute of limitations for 12 months after the death.

Tex. Civ. Prac. & Rem. Code § 16.062.

The purpose of the tolling statute is to "protect from secret tollings or extensions the unknowing bona fide purchaser who acquires the land when the limitations period on the debt has facially expired."   Davidson v. F.D.I.C., 44 F.3d 246, 254 (5th Cir. 1995) (citing Tex. Civ. Prac. & Rem. Code § 16.035).   Therefore, as provided by § 16.035(c), the statute of limitations will not be tolled against a bona fide purchaser for value, a lienholder, or a lessee with no notice of the suspension of the limitations period and who acquires an interest in the property except as provided by § 16.062.   However, pursuant to § 16.035, tolling due to death applies against all third parties.   Section 16.062 has no notice requirements; rather, it

simply provides that the "death of a person[6] . . . against whom there <u>may</u> be a cause of action suspends the running of the applicable statute of limitations for 12 months after the death."

Plaintiffs argue that the tolling statute only tolls as to a lienholder who has no notice or knowledge of the suspension of the limitations period and who acquires an interest in the property when a cause of action on an outstanding real property lien has accrued for more than four years.   Thus, Plaintiffs argue that because it is undisputed that Defendants had knowledge of the death of Galland, they had "notice of knowledge of the suspension of the limitations period" that could potentially apply due to Galland's death and, therefore, the one-year tolling does not apply.  (Dkt. # 81 ¶ 14.)   However, as discussed above, § 16.062 does not provide for any notice requirements; rather, it clearly states that death of a person against whom there may be a cause of action suspends the running of the applicable statute of limitations for 12 months after the death—§ 16.062 is not modified by the notice requirements of § 16.035.

Plaintiffs also argue that § 16.062, by its terms, does not apply to extend the statute of limitations for non-judicial foreclosure sale.    (Dkt. # 81 ¶ 16.)   However, by its plain language, § 16.062 provides that the "death of a

---

[6]  It is undisputed that Galland, as the debtor, was certainly a person that Defendants may have had a cause of action against.

person against whom or in whose favor there <u>may</u> be a cause of action tolls the applicable statute of limitations for 12 months."   Tex. Civ. Prac. & Rem. Code § 16.062 (emphasis added).   Thus, there is no requirement that a suit <u>actually</u> be filed, but rather only a possibility that one <u>may</u> potentially be filed.   Therefore, the Court rejects Plaintiffs' arguments that because Defendants ultimately elected to seek a non-judicial foreclosure rather than a judicial claim on the note the tolling does not apply; Plaintiffs' argument is without merit.

Because the one-year tolling period applied, the statute of limitations did not run on Defendants' ability to foreclose on the Property; therefore, Plaintiffs are not entitled to summary judgment on this issue.

B.    <u>Plaintiffs' Notice Argument</u>

Next, Plaintiffs argue that because notice of the foreclosure was not provided to them, the foreclosure is wrongful as a matter of law.   Specifically, Plaintiffs assert that "they were entitled to notice of the foreclosure because they had contractually agreed to pay off the debt in question (via the MSA) and were in privity of contract with the Defendants in connection with the debt."   (Dkt. # 81 ¶ 23.)   In response, Defendants argue that because Plaintiffs did not assume the Galland loan and, thus, were not parties to the Deed of Trust, they were not entitled to notice.   (Dkt. # 92 at 13–14.)

First, Texas courts are clear that noticing irregularities and noticing

33

defects do not make the foreclosure entirely unenforceable.    Elbar Invests., Inc. v. Wilkinson, No. 14-99-002970CV, 2003 WL 22176624, at *2 (Tex. App. 2003) ("[D]efective notice . . . merely renders a foreclosure sale voidable, not void."). Plaintiffs argue that, essentially, where no notice is provided, a foreclosure may be wrongful as a matter of law because it is void; thus, in such a scenario, a plaintiff need not show the remaining elements of a wrongful foreclosure claim in order to prevail.

Plaintiffs cite Harwath v. Hudson, 654 S.W.2d 851 (Tex. App. 1983) for the proposition that a foreclosure sale is invalid where the substitute trustee did not comply with notice provisions of the deed of trust, thus ostensibly arguing that this case demonstrates that proof of a grossly inadequate sale price is not required to prove the sale is invalid.    However, the court in Harwath noted that "the price of $100,000.00 paid for the property at the sale, by [defendant], was grossly inadequate, [and] the fair market value of the property on the date of the sale was $1,905,000.00."    Id. at 852.    Thus, there clearly was a grossly inadequate sale price in Harwath and it therefore does not support Plaintiffs' proposition.

The Court agrees with Plaintiffs that, in some cases, a plaintiff is not required to establish a grossly inadequate sale price in order to prevail on a claim that a property was wrongfully foreclosed upon.    Miller v. BAC Home Loans Serv., L.P., 726 F.3d 717, 727 (5th Cir. 2013) ("[The] three-part standard—in

particular the requirement to show a grossly inadequate selling price—does not

apply to all wrongful foreclosure claims under Texas law.").   For example, in a

case where a plaintiff alleges <u>no</u> notice (as opposed to merely a defect in the

notices provided), proof of an inadequate sale price may not be required.

In <u>Matthews v. JPMorgan Chase Bank, NA</u>, No. 3:11-CV-00972-M,

2011 WL 3347920, at *1–2 (N.D. Tex. Aug. 1, 2011), the court denied defendant's

motion to dismiss plaintiff's claim for wrongful foreclosure.   The court recited the

three elements for wrongful foreclosure (including a grossly inadequate sale price),

but concluded that plaintiff's claims were not subject dismissal even though

plaintiff had not explicitly alleged an inadequate sale price where plaintiff alleged

that he was given <u>no</u> notice.   <u>Id.</u>   This makes sense when considering the

standard:   "A claim for 'wrongful foreclosure' is not available based merely on

showing of a <u>defect</u> in the foreclosure process; it is also necessary that there be an

inadequate selling price resulting from the defect."   <u>Biggers v. BAC Home Loans</u>

<u>Serv., LP</u>, 767 F. Supp. 2d 725, 729 (N.D. Tex. 2011) (emphasis added).   Where a

plaintiff merely alleges a "defect" in the notices provided them (i.e., they received

notice 21 days before the foreclosure when the Property Code requires 20 days),

plaintiffs must also show a grossly inadequate sale price that was caused by the

alleged "defect."   However, where a plaintiff claims they received no notice at all

(i.e., "I came home one day and my house was sold!"), a claim for wrongful

35

foreclosure may still be maintained regardless of an inadequate sale price.

In any event, Plaintiffs here can hardly argue they had no notice at all that the Property was subject to foreclosure.    The MSA clearly provided that if they did not tender $120,000 before December 31, 2011, Defendants were entitled to foreclose.    Thus, Plaintiffs here have not demonstrated that a scenario where they had no notice at all that the Property was subject to foreclosure at any time. Therefore, even assuming Plaintiffs were entitled to notice and were not provided with such, failure to provide notice would not render the foreclosure void.[7]    Thus, the Court declines Plaintiffs' request to "take this opportunity to hold that proof of a grossly inadequate sale price" is not required in this case, (see Dkt. # 96 ¶ 26), and the alleged lack of notice only goes towards the first element of their wrongful foreclosure claim (i.e. a defect in the foreclosure proceeding).

Failure to provide required notice may certainly be considered a "defect" in a foreclosure proceeding for purposes of a wrongful foreclosure claim. See Sauceda v. GMAC Mortg. Corp., 268 S.W.3d 135, 139 (Tex. App. 2008). However, Defendants cite American Savings and Loan Association of Houston v. Muscik, 531 S.W.2d 581, 588 (Tex. 1978) for the proposition that "[t]here is no

---

[7] "'Void' means the sale has no legal efficacy and is incapable of being enforced by law, such as a foreclosure sale of a lien not in default."    Elbar, 2003 WL 22176624, at *2 (citations omitted).

requirement that personal notice be given to persons who were not parties to the

deed of trust."    Therefore, Defendants argue that they did not have a legal duty to

provide notice of foreclosure to Plaintiffs because Plaintiffs were not parties to the

Deed of Trust.    See Cuauhtli v. Chase Home Fin. LLC, 252 F. App'x 690, 692

(5th Cir. 2007) ("The personal notice that must be given to debtors is not owed to

residents of the property who are not personally liable for the debt"); Stanley v.

CitiFinancial Mortg. Co., Inc., 121 S.W.3d 811, 817 (Tex. App. 2003) ("There is

no legal requirement that personal notice of a foreclosure be sent to persons not

parties to the deed of trust.").

Plaintiffs respond that they were entitled to notice because they were

obligated on the debt, and thus were in privity, pursuant to the underlying state

court judgment between Galland and Plaintiff that awarded Plaintiffs the Property.

Plaintiffs have attached the state court judgment which states, in relevant part:

> It is ordered and agreed that Plaintiffs shall pay off the entire balance
> of the mortgage, the outstanding loan balance owed by Jon R. Galland
> on the property commonly known as 2 Walnut Grove, Boerne,
> Kendall County, Texas 78006 . . . .

(Dkt. # 81-1 at 7.)    Thus, Plaintiffs argue, Defendants "unambiguously took the

position that Plaintiffs were liable to pay the loan."    (Dkt. # 81 ¶ 26.)    Further,

Plaintiffs attach an October 21, 2009 letter from Defendants' previous counsel, in

which Defendants explicitly agreed to provide Plaintiffs with notice of any

37

foreclosure sale:

> Dear Mr. & Mrs. Porterfield:
>
> Before my involvement in this case, you reached an agreement with former in-house counsel for Washington Mutual to the effect that foreclosure proceedings would not be initiated or resumed with respect to the property at issue without prior notice to you.   This will confirm that the agreement remains in place and that JPMorgan Chase, N.A. will not initiate foreclosure proceedings, or resume the previous actions, without prior notice to you.
>
> Please know that the records on the property have been designated such that no proceedings should be instituted without this notice.   As you know, mistakes and/or electronic glitches can occur. In the unlikely event that action is taken contrary to this agreement, JPMorgan Chase Bank, N.A. agrees that you may use this letter as evidence of its agreement to provide at least 45 days notice of any intended foreclosure action on the subject property.
>
> Please call should you have any questions concerning this or should you need further information.

(Dkt. # 81-1 at 19.)   Moreover, Plaintiffs assert that they were previously provided with notices of foreclosure in connection with Defendants' prior attempts to foreclose on the property.   (Id. at 4 ¶ 23.)

Plaintiffs have certainly raised a genuine issue of material fact as to whether they were entitled to notice and were not provided with such.   However, even assuming the evidence presented by Plaintiffs conclusively establishes that they were not provided notice, as discussed above Plaintiffs must still prove a grossly inadequate selling price and a causal connection between the failure to

provide notice and the grossly inadequate selling price.   See Water Dynamics,

509 F. App'x at 369.   However, Plaintiffs have not argued that the sale price was

grossly inadequate, instead relying upon the argument that failure to provide notice

in and of itself rendered the foreclosure void and therefore wrongful as a matter of

law.   As discussed above, however, notice defects such as the one alleged in this

case merely demonstrates a defect in the foreclosure proceeding as part of a

wrongful foreclosure claim.   Accordingly, because they have not proved a grossly

inadequate selling price and a causal connection between the failure to provide

notice and the grossly inadequate selling price, Plaintiffs are not entitled to

summary judgment on their wrongful-foreclosure claim.

     C.    <u>Defendants' Motion for Summary Judgment on Plaintiffs' Wrongful Foreclose Claim</u>

Defendants have also moved for summary judgment on Plaintiffs'

wrongful-foreclosure claim asserting that (1) Plaintiffs were not entitled to notice,

and (2) the sale price was not grossly inadequate as a matter of law.   (Dkt. # 92 at

13–16.)   As discussed in the previous section, Plaintiffs have established there is a

genuine issue of material fact as to whether they were entitled to notice.

However, if the sale price was not "grossly inadequate," Plaintiffs cannot prevail

on their wrongful-foreclosure claim.

Defendants argue that even assuming Plaintiffs were entitled to notice

39

and did not receive it, they cannot demonstrate that the sale price was grossly inadequate because a sale price of more than fifty percent of the property value is not grossly inadequate as a matter of law.   (Id. at 16.)   Indeed, "Texas cases establish that a foreclosure price exceeding 50% is not grossly inadequate." Water Dynamics, Ltd., 509 F. App'x at 369.

Defendants have attached the Kendall County Appraisal District record on the Property, demonstrating an appraised value of $249,870.00 for the year the Property was foreclosed upon, 2012.   (Dkt. # 92, Ex. G-1.)   Defendants attach the substitute trustee's deed demonstrating a sale price of $204,879.40, (id.,Ex. F-2), which was more than fifty percent of the property value; therefore, Defendants argue the sale price was not grossly inadequate as a matter of law. (Id. at 16.)   The Court agrees.

Because Defendants have conclusively proven that the sale price in this case was not grossly inadequate, the Court concludes Defendants are entitled to summary judgment on Plaintiffs' wrongful-foreclosure claim.

III.   Unreasonable Debt Collection Claim

Defendants next move for summary judgment on Plaintiffs' unreasonable debt collection claim.   (Dkt. # 92 at 16.)   Defendants argue that Plaintiffs' claim fails because (1) Defendants did not attempt to collect any debt from Plaintiffs, who were not the debtor; (2) Plaintiffs do not allege they suffered

any physical or other damages as a result of any debt collection effort; and

(3) Defendants did not engage in outrageous conduct by following the terms of the

MSA.   (<u>Id.</u> at 17.)

Unreasonable debt collection is an intentional tort.   <u>EMC Mortg. Corp.</u>

<u>v. Jones</u>, 252 S.W.3d 857, 868 (Tex. App. 2008).   However, the elements of the

claim are not clearly defined as the conduct which gives rise to an unreasonable

collection effort varies from case to case.   <u>Id.</u>   Generally speaking, however, to

recover on such a claim a plaintiff must prove that "[a] defendant['s] debt collection

efforts 'amount to a course of harassment that was willful, wanton, malicious, and

intended to inflict mental anguish and bodily harm.'"   <u>Narvaez v. Wilshire Credit</u>

<u>Corp.</u>, 757 F. Supp. 2d 621, 635 (N.D. Tex. 2010) (quoting <u>Steel v. Green Tree</u>

<u>Servicing, LLC</u>, No. 3:09-cv-0603-D, 2010 WL 3565415, at *6 (N.D. Tex. Sept. 7,

2010)); <u>see</u> <u>EMC Mortg. Corp.</u>, 252 S.W.3d at 868 ("One of the more precise legal

descriptions delineates the conduct giving rise to the tort as 'efforts that amount to a

course of harassment that was willful, wanton, malicious, and intended to inflict

mental anguish and bodily harm.'" (citing <u>Montgomery Ward & Co. v. Brewer</u>, 416

S.W.2d 837, 844 (Tex. App. 1967))).

Plaintiffs have not responded to Defendants' arguments for summary

judgment on Plaintiffs' unreasonable debt collection claim.   Finding no evidence of

conduct that is "willful, wanton, malicious, and intended to inflict mental anguish

41

and bodily harm," <u>Narvaez</u>, 757 F. Supp. 2d at 635, the Court concludes that

Defendants are entitled to summary judgment on Plaintiffs' unreasonable debt

collection claim.

IV.   <u>Negligent Misrepresentation Claim</u>

   Defendants argue they are entitled to summary judgment on Plaintiffs'

negligent misrepresentation claim.   (Dkt. # 92 at 17.)   Specifically, Defendants

argue that Plaintiffs' negligent misrepresentation claim (1) is barred by the

economic loss rule, and (2) otherwise fails as a matter of law because the alleged

misrepresentations were promises of future action.   (<u>Id.</u>)

   To establish a claim for negligent misrepresentation, a plaintiff must

demonstrate the following elements: (1) the misrepresentation is made by a

defendant in the course of his business, or in a transaction in which he has a

pecuniary interest; (2) the defendant supplies "false information" for the guidance of

others in their business; (3) the defendant did not exercise reasonable care or

competence in obtaining or communicating the information; and (4) the plaintiff

suffers pecuniary loss by justifiably relying on the representation.   <u>Fed. Land Bank</u>

<u>Ass'n of Tyler v. Sloane</u>, 825 S.W.2d 439, 442 (Tex. 1991).

   "[W]hen a written contract exists, it is more difficult for a party to show

reliance on subsequent oral representations."   <u>Pradhan v. JP Morgan Chase Bank,</u>

<u>N.A.</u>, No. 4:12cv538, 2013 WL 617601, at *2 (E.D. Tex. Feb. 19, 2013) (quoting

Beal Bank, S.S.B. v. Schleider, 124 S.W.3d 640, 651 (Tex. App. 2003)).

"Generally, 'negligent misrepresentation is a cause of action recognized in lieu of a

breach of contract claim, not usually available where a contract was actually in force

between the parties.'"   Id. (quoting Airborne Freight Corp. Inc., v. C.R. Lee Enters.,

Inc., 847 S.W.2d 289, 295 (Tex. App. 1992)).

Defendants first assert that Plaintiffs' negligent misrepresentation

claims are barred by the economic loss rule.   Under Texas's economic loss rule no

duty in tort exists when plaintiffs have suffered only economic losses.   Mem'l

Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH, 524 F.3d 676,

678 (5th Cir. 2008); see Preston v. Seterus, Inc., 931 F. Supp. 2d 743, 766 (N.D. Tex.

2013) ("[T]he economic loss rule 'generally precludes recovery in tort for economic

losses resulting from the failure of a party to perform under a contract.'" (quoting

Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 12 (Tex. 2007))).

"Therefore, in Texas, the economic loss rule bars plaintiffs from 'recover[ing]

economic losses resulting from a defective product based on a negligence theory.'"

Id. (quoting Hininger v. Case Corp., 23 F.3d 124, 126 (5th Cir. 1994)).   Tort

damages, therefore, are not generally recoverable if the defendant's conduct "would

give rise to liability only because it breaches the parties' agreement;" tort damages

are recoverable, however, if the defendant's conduct "would give rise to liability

independent of the fact that a contract exists between the parties."   Preston, 931 F.

43

Supp. 2d at 766.   "The rule restricts contracting parties to contractual remedies for such economic losses, even when the breach might reasonably be viewed as a consequence of the contracting party's negligence."   <u>Pradhan</u>, 2013 WL 617601, at *2.   "[I]n order for a tort duty to arise out of a contractual duty, . . . the liability must arise independent of the fact that a contract exist between the parties; the defendant must breach a duty imposed by law rather than by the contract."   <u>Id.</u>

The Supreme Court of Texas has "adopted a broad interpretation of the economic loss rule."   <u>Id.</u>   "According to the Texas Supreme Court, 'the nature of the injury' may preclude plaintiffs from seeking relief in tort, and '[w]hen the injury is only the economic loss to the subject to a contract itself, the action sounds in contract alone.'"   <u>Id.</u> (quoting <u>Jim Walker Homes, Inc. v. Reed</u>, 711 S.W.2d 617, 618 (Tex. 1986)).   Thus, the "nature of the injury, not the nature of the damages, affects the applicability of the economic loss rule."   <u>Pradham</u>, 2013 WL 617601, at *2.   A court therefore examines a plaintiff's allegations to determine whether the injuries alleged are to the subject to the contract itself.   <u>Id.</u> at *3.

Defendants argue that the negligent misrepresentation claim arises from the alleged promises to obtain and record releases of the alleged judgment liens, to extend the time to tender payment, and to refrain from foreclosure (Dkt. # 92 at 18); because the relationship between the parties is defined by the Deed of Trust and the MSA, and any obligations between the parties are a matter of contract,

44

Defendants argue that the economic loss rule applies.   (Id.)

Plaintiffs respond that the economic loss rule does not apply.   (Dkt. # 99 at 10.)   Specifically, they assert that Defendants "made false misrepresentations to Plaintiffs to the effect that the property in question was not subject to foreclosure while the judgment lien issue in question was being resolved and that the time for Plaintiffs to perform under the MSA had been extended."   (Id.) These representations were allegedly made after the deadline for plaintiffs to pay off the mortgage loan had passed and, thus, Defendants could foreclose at any time pursuant to the MSA.   These representations, if made, would not simply "give rise to liability only because it breaches the parties' agreement;" rather, these representations "would give rise to liability independent of the fact that a contract exists between the parties."   Preston, 931 F. Supp. 2d at 766.   Therefore, the representations were made independently of the contract and the economic loss rule would not apply.

Next, Defendants argue that Plaintiffs' negligent misrepresentation claims fail as a matter of law because they are promises of future action which are not actionable.   "A promise to do or refrain from doing an act in the future is not actionable because it does not concern an existing fact."   Thomas v. EMC Mortg. Corp., 499 F. App'x 397, 342 (5th Cir. 2012).   In Thomas, the Fifth Circuit affirmed the district court's conclusion that no summary judgment evidence was

45

presented on the plaintiffs' negligent misrepresentation claim.   Id.   The district court found that the only evidence plaintiffs presented that could even possibly allege an "existing fact" was an affidavit from one of the plaintiffs stating the "[defendants] told [plaintiffs] that their loan modification was in process, and later, that it was in underwriting."   Id.   The Fifth Circuit agreed that such evidence did not allege an existing fact, noting that "[plaintiffs'] attempt to characterize the banks' supposedly broken promises as 'existing facts' is unpersuasive . . . [b]ecause representations regarding future loan modifications and foreclosure constitute 'promises of future action rather than representations of existing fact,' the negligent misrepresentation claim was properly dismissed."   Id. (internal citations omitted). Here, however, Plaintiffs allege that Defendants represented that the Property was not subject to foreclosure while the judgment lien releases were being obtained.   In his deposition, John Porterfield states:

> [I]n the spring of 2012, Defendant Deutsche Bank's attorney Darrell Smith represented to me that he was working to remove the judgment liens and that the property was not subject to foreclosure while he was obtaining and filing the judgment lien releases.

(Dkt. # 99-1 ¶ 5.)   Thus, these were not promises that Defendants would not foreclose in the future, but rather were representations of an existing fact that the Property was not subject to foreclosure during the pendency of the filing of the releases and that Smith was presently working to remove the judgment liens.

46

Accordingly, Plaintiffs have presented enough evidence to defeat summary

judgment on their negligent misrepresentation claims.

V.      TDCPA claims

        Next, Defendants assert they are entitled to summary judgment on

Plaintiffs' Texas Debt Collection Practices Act ("TDCPA") claims.   (Dkt. # 92 at

19.)

        The TDCPA prohibits debt collectors from using various forms of

threatening, coercive, harassing, or abusive conduct to collect debts from

consumers.   Holloway v. Wells Fargo Bank, N.A., No. 3:12-CV-2184, 2013 WL

1187156, at *8 (N.D. Tex. Feb. 26, 2013).   In general, the TDCPA provides

remedies for wrongful debt collection practices arising out of a debtor/creditor

relationship.   Ford v. City State Bank of Palacios, 44 S.W.3d 121, 135 (Tex. App.

2001).

        The TDCPA  protects "consumers" and the only prerequisite to

"consumer" status is having a "consumer debt."   Tex. Fin. Code § 392.001(1).

However, "the remedies the TDCPA affords are not limited to the actual parties to a

consumer transaction."   Cushman v. GC Servs., LP, 657 F. Supp. 2d 834, 841 (S.D.

Tex. 2009) ("Any person against whom the prohibited acts are committed may

maintain an action for actual damages sustained as a result of those violations.")

(citing Campbell v. Beneficial Fin. Co. of Dall., 616 S.W.2d 373, 375 (Tex. App.

1981))).   In <u>Brush v. Wells Fargo Bank, N.A.</u>, 911 F. Supp. 2d 445 (S.D. Tex.

2012), the court discussed the "individualized approach" to standing and the right to

sue under the TDCA:

> In <u>Campbell v. Beneficial Finance Co. of Dallas</u>, 616 S.W.2d
> 373, 375 (Tex. App. 1981), an intermediate Texas appellate court held
> that certain nondebtors may assert TDCA claims that arise out of the
> "debtor/creditor relationship."   The plaintiff sued a bank for making
> repeated harassing telephone calls to her in an attempt to get her to
> disclose contact information for her daughter and son-in-law, who had
> borrowed from the bank.   The court noted that, "while the threat,
> coercion, harassment or abuse must occur in connection with the
> collection or attempted collection of a debt allegedly owed by a
> consumer, persons other than the debtor may maintain an action for
> violations of the Act."   <u>Id</u>. at 375.   The court held that "[a]ny person
> against whom the prohibited acts are committed may maintain an
> action for actual damages sustained as a result of those violations."   <u>Id.</u>
> The nondebtor plaintiff could sue the bank for the harassing phone calls
> because "[t]he alleged abuses were committed directly against her."
> <u>Id.</u>
>
> In another case, <u>Prophet v. Myers</u>, 2009 WL 1437799, at *5
> (S.D. Tex. May 21, 2009), a debtor's father sued a debt collector after
> the father found a demand letter addressed to his estranged son. In
> considering whether the plaintiff had standing, the federal court cited
> <u>Campbell</u> but distinguished it on the facts, noting that the debt collector
> in <u>Campbell</u> directed the harassment against the debtor's mother rather
> than the debtor.   <u>Id.</u>   By contrast, in <u>Prophet</u>, "the letter could only
> reasonably be interpreted to be directed to Plaintiff's son, as it was
> mailed to Plaintiff's son's address and pertained to a debt incurred by
> Plaintiff's son."   <u>Id.</u> at *2.   The court held that the plaintiff lacked
> standing under the TDCA because he failed to show that "any of the
> alleged abuses were directed against him." <u>Id.</u> at *5.

<u>Id.</u>, 911 F. Supp. 2d at 472.   Based on this analysis, the Court finds no reason why

Plaintiffs would not have standing under the TDCPA—there was a debtor/creditor

relationship between Galland and Defendant Deutsche Bank, and it is not disputed that the mortgage was a "consumer debt."   Thus, because the remedies the TDCPA affords are not limited to the actual parties to a consumer transaction, Cushman, 657 F. Supp. 2d at 841, and any person against whom the prohibited acts are committed may maintain an action for actual damages sustained as a result of violations of the TDCPA, Campbell, 616 S.W.2d at 375, Plaintiffs may have standing to bring a cause of action under the TDCPA for violations directed at them.

Plaintiffs assert that Defendants violated the TDCPA by (1) foreclosing on the property in question after promising not to do so while releases of the judgment liens in question were being obtained, (2) by foreclosing on the property without providing the statutorily and contractually required notice, and (3) by foreclosing on the property on the basis of a void deed of trust.   (Dkt. # 99 at 11.)

However, as discussed above, although Plaintiffs argue the Deed of Trust was void due to expiration of the statute of limitations, the Deed of Trust was not void as the statute of limitations was tolled for a twelve-month period following the death of Galland.   Thus, Plaintiffs' TDCPA claim based upon a "void deed" fails.

Additionally, as discussed above, although Plaintiffs have raised a genuine issue of material fact as to whether they were provided notice of the foreclosure in support of their wrongful foreclosure claim, Plaintiffs have failed to

49

allege what section of the TDCPA is implicated by the failure to provide "statutorily and contractually required notices."   (Dkt. # 99 at 11.)   In their Response to Defendants' Motion for Summary Judgment, Plaintiffs have cited to two sections of the TDCPA that they allege are implicated by Defendants' conduct.   First, Plaintiffs cite to Texas Finance Code § 392.304(a)(8), which provides that a debt collector commits a violation by "misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental proceeding."   Tex. Fin. Code § 392.304(a)(8).   Second, Plaintiffs cite the "catch-all" provision, § 392.304(a)(19), which provides that a debt collector commits a violation by "using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer."   Tex. Fin. Code § 392.304(a)(19).

Arguably, failing to provide Plaintiffs with notice of the foreclosure sale and thereafter foreclosing after agreeing in a written letter to Plaintiffs not to foreclose without providing notice constitutes using "false representation[s] or deceptive means to collect a debt."   (See Dkt. # 81-1 at 19.)

Plaintiffs have additionally alleged that Defendants violated the TDCPA by foreclosing on the property in question after promising not to do so while releases of the judgment liens in question were being obtained.   Presumably, Plaintiffs argue that Defendants violated § 392.304(a)(19) of the TDCPA, which

50

prohibits a debt collector from using a false representation or deceptive means to

collect a consumer debt, by falsely representing to them that foreclosure would not

occur while releases of the judgment liens were being obtained.   As evidence of

their claim, Plaintiffs cite to the following excerpts from John Porterfield's

declaration:

> 13. At the mediation, Defendant Chase's current attorney Wm. Lance
> Lewis stated that Chase would ensure that the releases of the judgment
> liens were filed by Fidelity National Title Insurance Company as Chase
> had a long working relationship with Fidelity National Title Insurance
> Company.   Although Chase did not sign the MSA, it participated in
> the mediation as the agent of Deutsche Bank and asserts rights pursuant
> to that agreement and thus is bound by the MSA signed by its principal.
>
> . . . .
>
> 19. The December 31, 2011 deadline for my wife and I to tender the
> $120,000.00 passed, but the parties continued to confer on obtaining
> and filing releases of the judgment liens.   In the spring of 2012,
> Defendant Deutsche Bank's attorney Darrell Smith represented to me
> that he was working to remove the judgment liens and that the property
> was not subject to foreclosure while he was obtaining and filing the
> judgment lien releases.   Prior to the deadline we offered to deposit the
> $120,000.00 in the registry of the Court, but received no response to
> that offer.

(Dkt. # 81-1 at 3–4.)   This evidence, although minimal, raises a genuine issue of

material fact as to whether Smith made false representations to Plaintiffs that the

Property was not subject to foreclosure while he was working to remove the

judgment liens.   It is undisputed that the judgment liens releases were never filed

and the Property was foreclosed upon in August 2012.   Defendants have not set

forth conclusive evidence to demonstrate that Plaintiffs' TDCPA claims regarding false representations made as to the Property's eligibility for foreclosure and regarding Defendants' failure to provide notice to Plaintiffs fail as a matter of law. Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' TDCPA claims.

VI.     DTPA claims

Next, Defendants assert that they are entitled to summary judgment because Plaintiffs' Deceptive Trade Practices Act ("DTPA") claims fail as a matter of law.   (Dkt. # 92 at 21.)

Generally, a plaintiff in a DTPA action must show (1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, deceptive, or unconscionable acts, and (3) those acts constituted a producing cause of the consumer's damages.   Henning v. OneWest Bank FSB, 405 S.W.3d 950, 968 (Tex. App. 2013).   The DPTA was enacted to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty.   See Tex. Bus. & Com. Code Ann. §§ 17.41–.63; Cushman, 657 F. Supp. 2d at 842.   Thus, a plaintiff's standing to bring suit on a DTPA claim hinges on whether he qualifies as a "consumer" under the DTPA.   Cushman, 657 F. Supp. 2d at 842.

Plaintiffs assert that they are consumers under the TDCPA because

their claims arise out of consumer debt, and that because they are "consumers" under the TDCPA, they are also "consumers" for purposes of the DTPA because those TDCPA claims are actionable under the DPTA.   (Dkt. # 99 at 12.)   Essentially, Plaintiffs assert they are "consumers" under the DTPA because they have asserted a claim for a violation of the TDCPA, which constitutes a DTPA action.   See Tex. Bus. & Com. Code Ann. § 17.50; Tex. Fin. Code Ann. § 392.404(a) ("violation of this chapter is a deceptive trade practice under Subchapter E, Chapter 17, Business & Commerce Code").

However, Plaintiffs' arguments are not valid as the DTPA's definition of "consumer" is different from that found in the TDCPA.[8]   Cushman, 657 F. Supp. 2d at 842.   The fact that a plaintiff is a "consumer" under the TDCPA is irrelevant in the determination of whether he qualifies as a "consumer" under the DTPA.   Id.; see Brush, 911 F. Supp. 2d at 447 ("Because the definitions or 'consumer' under the TDCA and the DTPA are different, individuals who are consumers under one may not be under the other.")

"To establish DTPA 'consumer' status: '(1) a person must have sought or acquired, goods or services, by purchase or lease, and (2) the goods or services,

---

[8]   Section 392.001 of the TDCPA defines "consumer" as "an individual who has a consumer debt."   Section 17.45 of the DTPA, on the other hand, defines "consumer" as "an individual . . . who seeks or acquires by purchase or lease, any goods or services . . . ."

53

purchased or leased, must form the basis of the complaint.'" <u>Id.</u> (quoting <u>Burleson</u>

<u>State Bank v. Plunkett</u>, 27 S.W.3d 605, 614 (Tex. App. 2000)).

       In this case, there is no evidence that Plaintiffs acquired, by lease or

purchase, goods or services that form the basis of their DTPA claim.   Here,

Plaintiffs obtained title to the Property through a judgment based on a contract to

purchase the property from Galland.   Thus, Plaintiffs did not purchase goods from

Defendants and their "purchase" cannot form the basis of their complaint against

Defendants.   Accordingly, Plaintiffs are not "consumers" under the DTPA, and

Defendants are granted summary judgment as a matter of law on those claims.

VII.   <u>Defendant/Counter-Plaintiffs' Breach of Contract Counterclaim</u>

       Defendants have also moved for summary judgment on their breach of

contract counterclaim.   (Dkt. # 92 at 25.)   Defendants argue that there is no

material issue of fact as to whether Plaintiffs' breached the MSA.   (<u>Id.</u>)

Specifically, Defendants assert that Plaintiffs breached the MSA by contesting the

foreclosure after they agreed not to contest, thwart, or otherwise delay foreclosure if

they failed to tender the negotiated sum and failing to vacate the property.[9]   (<u>Id.</u> at

27.)

       The MSA provided that

---

[9]  Defendants assert that Plaintiffs have failed to vacate the Property and continue
to rent the Property to tenants.

> If Plaintiffs tender this amount by that date, Deutsche Bank will
> promptly release its lien.    If Plaintiffs fail to tender this amount by
> that date, Deutsche Bank may foreclose the lien on the property, and
> Plaintiffs agree they will not oppose, contest or in any way delay or
> thwart the foreclosure.    Plaintiffs will also promptly vacate the
> property.

(Dkt. # 92, Ex. B-5 ¶ 6.)

While the MSA clearly provided that Plaintiffs agreed not to contest foreclosure in the event they did not tender the $120,000.00 payoff amount to Defendants, the Court concludes summary judgment on Defendants' counterclaim is inappropriate at this time.    According to Plaintiffs' Amended Complaint, and as discussed in this Order, Plaintiffs may well have had cause to contest the foreclosure and bring this suit based upon matters occurring subsequent to their signing of the MSA.    Because several of Plaintiffs' claims survive summary judgment and there is a genuine issue of material fact as to several issues, the Court concludes that summary judgment is inappropriate on Defendants' breach-of-contract counterclaim at this time.

<u>CONCLUSION</u>

Based on the foregoing, Plaintiffs' Partial Summary Judgment (Dkt. # 81) is **DENIED**; Defendants' Motion for Summary Judgment (Dkt. # 92) is **GRANTED IN PART AND DENIED IN PART**.

In sum, Plaintiffs' breach-of-contract claims for breaches of oral

contracts made after mediation and negligent misrepresentation claims survive

summary judgment and remain pending.   Plaintiffs' wrongful foreclosure claim,

unreasonable debt collection claims, Texas Debt Collection Practices Act

("TDCPA") claims, Texas Deceptive Trade Practices Act ("DTPA") claims, and

breach-of-contract claims asserting breaches of the MSA and breaches or oral

contracts made during mediation are dismissed.

      IT IS SO ORDERED.

      Dated: San Antonio, Texas, July 21, 2014.

_____
David Alan Ezra
Senior United States Distict Judge